COURT OF APPEALS

| | |
|---|---|
| PEOPLE OF THE STATE OF MICHIGAN, | UNPUBLISHED |
| | June 21, 2016 |
| Plaintiff-Appellee, | |
| v | No. 325399 |
| | Macomb Circuit Court |
| VIKTOR SHAHOLLI, | LC No. LC No.13-2806-FC |
| Defendant-Appellant. | |

Before: M. J. KELLY, P.J., and CAVANAGH and K. F. KELLY, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions for first-degree premeditated murder, MCL 750.316(1)(a), and felony-firearm, MCL 750.227b, for which he was sentenced to life without parole and two years' imprisonment, respectively. Finding no errors warranting reversal, we affirm.

## I. BASIC FACTS

The facts of this case are not in dispute. On November 20, 2012, defendant shot and killed his daughter-in-law's brother, Dashamir Matjani (Dashamir). At trial, defense counsel argued that there was no motive for defendant to kill Dashamir, whom he had helped immigrate to the United States from Albania. Defense counsel argued that the apparent lack of motive was proof of defendant's mental illness. In contrast, the prosecution argued that defendant's motive in killing Dashamir was to punish his daughter-in-law, Emira Shaholli (Emira).

Defendant had two sons, Arjan Shaholli (Arjan) and Bledar Shaholli (Bledar). Arjan was married to Emira. Defendant, Arjan's family, and Bledar's family all lived together in a large house on Hoffman Street in St. Clair Shores. Defendant had a masonry company where Arjan and Bledar worked, along with other extended family members, including Dashamir. As the head of the family, defendant controlled each family member's money. When the economy went into crisis and the housing market crashed, the home on Hoffman went into foreclosure. Defendant helped Arjan buy a house on Recreation Street and helped Bledar buy a house on Masonic.

On the day of the murder, the family was days away from eviction from the Hoffman home. Many members of the family were at the Recreation address, working on the home so that Arjan, Emira and their two young sons could move in. Emira testified that defendant had

-1-

been watching the boys and had left them at a family member's house. Emira retrieved the boys and brought them to the Recreation address. Defendant wanted to know why Emira had picked up the children and expressed his opinion that the children should not be there. Emira relented and returned to the Hoffman home with the boys. Defendant also went to the Hoffman home where he grabbed a shotgun. He returned to the Recreation house where he shot Dashamir. No one saw defendant shoot Dashamir and the gun found outside the home did not contain useable fingerprints. Nevertheless, defense counsel did not deny that defendant shot and killed Dashamir.

After finding out that Dashamir had been shot, but before finding out that he was dead, Emira called defendant. She asked him what he had done. Defendant admitted that he had shot Dashamir. Emira testified: "he said he did it so my family would never talk to me for the rest of my life and hate me for the rest of my life." She called police and told them that she knew who had shot her brother. Defendant was prepared to turn himself into police. He called his cousin, Basri Sulolli, and admitted to shooting "Ellie's brother" because "he swore on us."

Defendant's mental health – or lack thereof – was the focus at trial. There was no dispute that defendant had suffered from migraine headaches for many years. Defendant's sons noticed a change in defendant after their mother died in November 2010. Defendant lost enjoyment in working. While everyone agreed that defendant seemed depressed, they did not necessarily agree on the extent of defendant's depression. Bledar testified that defendant would sit in a chair and simply stare at the fireplace. Defendant also made comments to family members about how his wife would come and visit him in the night. Bledar noticed that defendant would "talk nonsense." Defendant's hygiene also went downhill. Arjan testified that defendant was depressed but that he was able to carry on daily activities like eating, dressing and driving. Emira acknowledged that defendant was sad, but he did not appear depressed to her because he was engaged in his usual activities. Defendant had been taking care of the children for the weeks before the murder and Emira had no concerns about defendant's mental health; she described him as a good grandfather to his grandchildren.

Dr. Gerald Shiener diagnosed defendant with severe depression, as well as vascular dementia, which impacted mood, judgment, impulse control, and the ability to appreciate the consequences of actions. Shiener opined that "the combination of dementia and depression impaired Mr. Shaholli's ability to appreciate the consequences of his actions, plan out complex activities, and control impulses that he had." Additionally, Shiener concluded that defendant's "impairments were not consistent with the ability to appreciate right from wrong . . .his impairments were not consistent with the ability to refrain from acting in the way that he did." Shiener did not believe that defendant was feigning his mental illness. Shiener believed the crime was without motive and "motiveless actions are more consistent with legal insanity and mental illness than obvious motives."

In contrast, Dr. Donna Rinnas, the director of evaluation services at the Center for Forensic Psychiatry, saw no evidence that defendant suffered from depression or dementia. Defendant's test scores were so low that it appeared defendant gave the wrong answers on purpose. It was Rinna's opinion that defendant "did not meet the criteria to be considered legally insane." She was critical of Shiener's failure to consider the police reports when determining whether defendant was legally insane at the time of the shooting. Rinnas considered the police

reports and noted that defendant's behavior that day, including driving, retrieving a firearm, returning to the Recreation home, and going to the police station where he admitted that he shot someone displayed purposeful and goal-driven activities as opposed to some random and confused act.

Like Rinnas, Dr. Eric Neal opined that defendant was malingering. Neal was a psychiatrist and the unit leader of a long-term unit at the Center for Forensic Psychiatry. Neal had the opportunity to observe defendant for three months while defendant was at the Center for Forensic Psychiatry. Neal also periodically met with defendant individually. Neal, who was Shiener's former student, disagreed with Shiener's findings. Neal noted that defendant's CT scan did not show any abnormalities of the brain and the MRI was inconclusive. Vascular dementia was particularized and required certain findings to diagnose. Neal did not believe defendant had vascular dementia, primarily because there was an absence of stroke.

The jury convicted defendant of first-degree premeditated murder and felony-firearm. He was sentenced as outlined above.

## II. COMPETENCY

Defendant argues that the trial court erred in finding that defendant was competent to stand trial. We disagree.

"The determination of a defendant's competence is within the trial court's discretion. *People v Newton*, 179 Mich App 484, 488; 446 NW2d 487 (1989). "An abuse of discretion occurs only when the trial court's decision is outside the range of reasonable and principled outcomes." *People v Kammeraad*, 307 Mich App 98, 140; 858 NW2d 490 (2014).

"The conviction of an individual when legally incompetent violates due process of law." *In re Carey*, 241 Mich App 222, 227; 615 NW2d 742 (2000). "To protect this right to due process, Michigan has enacted statutes and a court rule regarding the competency of criminal defendants." *Kammeraad*, 307 Mich App at 137. Pursuant to MCL 330.2020(1), a criminal defendant is presumed competent to stand trial. The statute specifically provides:

> A defendant to a criminal charge shall be presumed competent to stand trial. He shall be determined incompetent to stand trial only if he is incapable because of his mental condition of understanding the nature and object of the proceedings against him or of assisting in his defense in a rational manner. The court shall determine the capacity of a defendant to assist in his defense by his ability to perform the tasks reasonably necessary for him to perform in the preparation of his defense and during his trial.

-3-

"It is within the power of the circuit court to determine the capacity of a defendant . . . That decision, as with any judicial decision, must be based in fact." *People v Davis*, 310 Mich App 276, 293; 871 NW2d 392 (2015).[1]

At the competency hearing, Ancuta Matei testified that she was a medical doctor and board certified in adult and geriatric psychiatry. She was an assistant professor at Wayne State University and also conducted daily psychiatric evaluations. Matei evaluated defendant on March 28, 2014, interviewing him through an interpreter. Matei was "struck by [defendant's] inability to really give coherent logical information whether through interpreter or not. I was able to make some eye contact at times, but he was not able to give me . . . logical, coherent information about any of the events leading to him being in this particular situation and being evaluated by me." Defendant did not give inappropriate answers, but they were short and "nonelaborate." He had a "very sad affect, very perplexed affect when it came to confronting him with the allegations. And vacant . . .not really present, very indifferent at times." Defendant was unable to perform simple cognitive screening tests.

Family members had informed Matei that defendant had lost his wife to pancreatic cancer approximately three years before the evaluation. It was at that time that he began to display unusual behavior. Defendant stopped taking care of himself and began relying on family members for daily living. He lost interest in activities and his behavior became erratic. Matei believed that defendant had depression in the context of bereavement. He complained more of migraine headaches and chronic pain could aggravate depression. Matei testified that, if severe enough, a major depressive order combined with a pain disorder and cognitive disorder could affect competency. The fact that the crime was committed near the anniversary of his wife's death was significant in the context of major depressive disorder.

As part of the medical analysis, Matei reviewed an MRI report prepared by Dr. Aronov from February 5, 2013.[2] There was a very small hemorrhagic lesion, or bleeding on the brain, in the right posterior temporal lobe. Matei believed such a finding was consistent with vascular dementia and was a physical symptom of impairment. Absent other symptoms and her personal observation of defendant, it would not necessarily be significant. But Matei's clinical findings from her interview, combined with the MRI suggested that defendant was impaired. Because of his cognitive impairments, Matei concluded that defendant "was not really able to organize his thoughts in a logical way. He was not really able to plan . . . So that tells me that he is not able to make informed decisions at any point, even for simple decisions." Defendant also had "a highly suggestive vascular lesion of a cavernous angioma," which can cause memory problems and seizures, as well as "periventricular and deep cerebral white matter bilaterally," which were significant of ischemia (problems with blood flow); there was a "very high probability" that defendant had suffered mini strokes based on the migraine headaches.

---

[1] Defendant was initially found incompetent to stand trial by Judge Mark Fratercangeli on June 19, 2012. Defendant was later re-determined to be competent on June 21, 2013.

[2] She did not actually review the MRI itself.

Matei diagnosed defendant with significant impairment in functioning. He had a cognitive disorder consistent with symptoms of vascular dementia and had severe major depressive disorder. Matei explained that a cognitive impairment impacted memory, rational thought, organizing, planning and sequencing. Matei explained that vascular dementia included a disturbance in memory and executive function. An individual with the disease would have difficulty remembering things and performing daily activities. Matei did not believe that defendant was "malingering," meaning intentionally producing his symptoms "with a secondary gain." Ultimately, Matei opined that defendant was unable to understand the nature and the object of the proceedings and was incapable of assisting defense counsel.

Clinical neuropsychologist Firoza Van Horn visited defendant at the Macomb County Jail on October 11, 2013 and April 8, 2014 for a total of three hours. Defendant was "distant," "detached," "in his own world," and could not give Van Horn his background history or a version of what happened on the day of the murder. Van Horn did not even bother to administer tests. Defendant was delusional; he talked about his wife and how she visited him in jail. Van Horn did not believe that defendant was malingering. Like Matei, Van Horn believed that the abnormalities shown on the MRI confirmed her impressions that defendant may suffer from vascular dementia. Defendant had severe depression with a brain impairment. Van Horn did not believe that defendant had an understanding of the nature and object of the proceedings against him and was incapable of assisting counsel in his defense.

Dr. Gerald Shiener also testified for defendant. Shiener was Chief of Psychiatry at Sinai Grace Hospital and taught at Wayne State's Medical School and some law schools. Shiener interviewed defendant three times with the help of translators – in March 2012, April 2013, and March 2014. Shiener diagnosed defendant with "acute psychiatric illnesses, cognitive disorder vascular-type dementia," as well as major depression. Shiener found no evidence of malingering in defendant. Given defendant's statements that he saw his dead wife at night, Shiener believed defendant was "out of touch with reality." Shiener reviewed Aronov's report and also looked at the MRI himself. He believed that defendant's brain was small for a man his age, which was significant because it coincided with problems in memory, concentration, attention and behavior. Defendant also had some "vascular issue." There were objective indications on defendant's x-ray that coincided with Shiener's clinical observations. Shiener believed defendant was unable to understand the nature or object of the proceedings against him and was unable to assist in his defense.

Ronald Jamieson testified that he was a deputy at the Macomb County Jail and had the opportunity to observe defendant since August 2013. Jamieson considered defendant to be a "role model" inmate. Jamieson saw defendant communicate with other inmates. Defendant did not appear confused or unable to handle daily activities. Jamieson also observed defendant playing chess and checkers.

Adriatik Jeminaj testified that he was a corrections deputy at the Macomb County Jail and also spoke Albanian. Defendant was a model inmate with the exception of a statement defendant made on July 21, 2012 regarding wanting to twist the head of a mental health professional who had him transferred to jail.

-5-

Thomas Brewer testified that he was a forensic examiner at the Center for Forensic Psychiatry. He had a master's degree in social work and a Ph.D. in clinical psychology. Brewer met with defendant on October 7, 2013. Defendant appeared unkempt and disheveled. At times defendant's comments were on point and at other times he was entirely off the mark. Normally, Brewer would not expect to see such a variation (6/20/14 Competency Hearing, p 58.) Brewer testified: "And then at one point when I, after I'd gotten to the point where I realized that he was not going to cooperate, and I told him that I was going to have to tell Your Honor what my opinion was about his cooperation. He just, he terminated the interview and said [']screw this['] and he stopped the interview." Brewer was unable to perform any tests but concluded that defendant did not appear to be suffering from dementia. Based on his own observations as well as reviewing other reports, Brewer believed defendant was "feigning" or "grossly exaggerating" his symptoms.

Dr. Eric Neal testified that he was board certified in general and forensic psychiatry. He was a staff psychiatrist at the Center for Forensic Psychiatry. Defendant was under Neal's supervision from March 14, 2013 to June 25, 2013 "[a]nd so in three and a half months that I had him it was very important to observe his capacities and did his capacities match up with his presentation." While defendant's scores on some tests were so low that it indicated he needed a lockdown nursing unit, Neal noted that defendant "provided observational evidence that suggested he was oriented to his circumstances, he had planning capacity, he had sequential memory, he also had the ability to start and stop complex events and that he also could self advocate on a regular basis for himself." As an example, Neal pointed to the fact that defendant came out of his room, obtained a remote control for the television, watched a soccer match, and then returned the remote control. Defendant, whom Neal had no doubt suffered from migraine headaches, advocated on his own behalf regarding the amount of medicine he was due. Defendant also loved playing chess and although his family indicated that he had stopped playing, defendant would advise his fellow inmates on their moves.

The CT scan was important to Neal because it was administered with and without contrast and there were no abnormalities; the MRI did not include a contrast. For vascular dementia, there would need to be physical findings, cognitive findings, and known evidence of stroke. There were no physical findings of vascular dementia by the emergency room physician, internal medicine physician, or neurologist. While Neal did not dispute the findings of the MRI, he took issue with how those findings were applied relative to defendant's presentation. The MRI was also consistent with normal age-related changes and congenital anomalies. Neal opined that defendant was malingering. After observing defendant for three months, Neal questioned whether defendant even had depression.

Defendant called as rebuttal witnesses two of his fellow prisoners. Anthony Webster testified that he was in a cell adjacent to defendant for eight months. Each inmate in maximum security at the jail had two hours a day out of the cell. At no time did Webster see defendant play checkers, chess, or cards. Defendant would walk back and forth as a form of exercise, but kept mostly to himself. The only word Webster heard defendant say was "easy" when someone was yelling in another cell. Defendant would ask Webster for soccer scores.

Stanley Duncan testified that he was in a cell adjacent to defendant. Defendant would say "hi" but did not appear to understand much English. Duncan never heard or observed

defendant playing cards, dice, checkers or chess. They had coffee together every morning. Duncan, who did not know that defendant's wife was dead, would tease defendant that he needed to call his wife or she was going to "cut you off." Defendant would ask Duncan about his family. Sometimes defendant had trouble understanding English so Duncan would have to rephrase things or use hand gestures. Defendant loved soccer. There were occasions when defendant did not know what day it was or what was going on. Duncan once allowed defendant to use a razor blade to shave a portion of his face.

At the close of testimony and arguments, the trial court concluded that defendant was competent to stand trial. This finding was not an abuse of discretion. Contrary to defendant's contention, the trial court did not conclude that Shiener was "incapable" of reading the MRI and CT images. Instead, the trial court acknowledged that there were various interpretations of the images, but that the radiologist's opinion was the most important: "And I think the most poignant explanation is, and I think the most poignant statement was made by Dr. Neal that it is the radiologist who needs to properly evaluate the findings made in the tests such as the MRIs and that they are better suited because they are better studied." Additionally, the trial court was careful to state that it did not want to "diminish the testimony of the other doctors who had the opportunity to review the records, but I think significantly and substantially we need to look at which of the doctors had the opportunity to visit with the Defendant and observe the Defendant at more of a length of time than those that did not, such as Dr. Shiener, Dr. Matei . . . I think Dr. O'Neal's [sic] opinion is based on sound conclusions. I, as I indicated I'm not in a position to diminish the other doctors. I'm suggesting that the other doctors have formulated an opinion without the advantages of Dr. Neal." Thus, there is no support for defendant's claim that the trial court ignored his experts' opinions.

Defendant also argues that the trial court placed too much emphasis on the Center for Forensic Psychiatry's staff observations of defendant while ignoring testimony from defendant's fellow inmates. In fact, the trial court found that the inmates' testimony was further evidence that defendant was competent: "harmful indeed were the testimony of the inmates who on a daily basis are able to communicate with this Defendant." Defendant chatted about sports with those inmates and shared daily coffee with one. The trial court's finding was rooted in the evidence.

Finally, to the extent defendant argues that the trial court discounted trial counsel's claim that his client could not properly communicate, we take notice that defense counsel, Tim Barkovic, had an extensive history of bombastic behavior in Macomb County and has since resigned from the practice of law as part of an agreement with the Attorney Discipline Board. The veracity of the counsel's statements was for the trial court to determine.

It is clear that the trial court's findings were "based in fact," *Davis*, 310 Mich App at 293, and within the range of "reasonable and principled outcomes." *Kammeraad*, 307 Mich App at 140. Defendant asks this Court to substitute its judgment for the trial court, which it will not do.

## III. DOUBLE JEOPARDY

Defendant's first trial ended in a mistrial following opening statements. Defendant argues that the trial court erred when it concluded that the prosecutor's behavior was

unintentional. Defendant maintains that counsel was goaded into moving for a mistrial and that defendant's subsequent retrial violated his right against double jeopardy. We disagree.

"This Court reviews de novo questions of law, such as a double jeopardy challenge." *People v Gibbs*, 299 Mich App 473, 488; 830 NW2d 821 (2013). If such a challenge is based on a trial court's findings of fact in determining "whether a prosecutor intended to goad the defendant into moving for a mistrial," this Court reviews the findings for clear error. *People v Dawson*, 431 Mich 234, 258; 427 NW2d 886 (1988). "A finding of fact is clearly erroneous if, after a review of the entire record, an appellate court is left with a definite and firm conviction that a mistake has been made." *People v Antwine*, 293 Mich App 192, 194; 809 NW2d 439 (2011) (internal quotation marks omitted).

Both the United States and Michigan Constitutions protect a defendant "from being twice placed in jeopardy for the same offense." *People v Nutt*, 469 Mich 565, 574; 677 NW2d 1 (2004), citing US Const, Am V; Const 1963, art 1, § 15.

> The double jeopardy provisions of the Michigan and federal constitutions protect an accused from being twice put in jeopardy for the same offense. "Being twice put in jeopardy" includes being subjected to a retrial after the initial prosecution ends in a mistrial. An exception to the double jeopardy bar has been made, and retrials allowed, where the prosecutorial or judicial errors requiring the mistrial appear to have been innocent or were beyond the prosecutor's control. A general exception has also been made where the mistrial was granted on the defendant's motion or with his consent. Where prosecutorial conduct provoked the defendant's motion for mistrial, however, the Double Jeopardy Clause has sometimes been held to bar retrial. [*People v Dawson*, 431 Mich 234, 235-236; 427 NW2d 886 (1988) (internal footnotes omitted).]

*Dawson* affirmatively held that "retrial is barred where the prosecutor intended to goad the defendant into moving for a mistrial." *Id.* at 236. The *Dawson* Court looked to Justice Powell's concurrence in *Oregon v Kennedy*, 456 US 667; 102 S Ct 2083; 72 L Ed 2d 416 (1982), where Powell indicates that a prosecutor's subjective intent "often may be unknowable" and, therefore, in deciding a double jeopardy motion, a trial court "should rely primarily on facts and circumstances of a particular case." *Dawson*, 431 Mich 254. The Court held:

> Retrials are an exception to the general double jeopardy bar. Where a mistrial results from apparently innocent or even negligent prosecutorial error, or from factors beyond his control, the public interest in allowing a retrial outweighs the double jeopardy bar. The balance tilts, however, where the judge finds, on the basis of the "objective facts and circumstances of the particular case," that the prosecutor intended to goad the defendant into moving for a mistrial. [*Id.* at 257 (internal footnote omitted).]

In *Dawson*, the prosecutor conceded that it intentionally goaded defense counsel to move for a mistrial; therefore, the Court did not have to undertake such an analysis.

The following are excerpts from the prosecutor's opening statement:

Now, you heard in the beginning and some in voir dire that there was reference to different proofs and evidence and motive and things like that. First and foremost, motive is not an element. The People do not need to prove motive. In fact, many times there is no motive for murder. Self-defense isn't a motive for murder. Self-defense is justification. There is no murder for murder. But, in this case, ultimately it boils [down] to pride and power. It boils down to control. It boils down to Viktor Shaholli, of Albanian nationality, and his family. And it boils down, ultimately, to the death of an innocent bystander, Dashamir Matjani.

***

The defendant and his family at one point had a plan. They lived in St. Clair Shores and they lived in a beautiful, huge home. And it was being built for this one purpose, so that multiple families could create – I don't want to say a compound – but a community together. And the patriarch of that family was Viktor.

***

The compound, the communal environment was falling apart. Pride and power had its place . . .

***

Now, the big question you will hear is why? Why did he do it? Frankly, the answer to that doesn't matter. I did it is what matters. And she'll tell you the motive. She asked him why. He said so the rest of the family will hate you. And you heard the term 'crazy' being thrown around. That seemed like a crazy rationale. But that's layperson crazy. That's not you and I. There is no rational, reasonable basis for doing something like that. But that is not legal insanity. Jihad is crazy to me. But that's not legal insanity.

Defense counsel moved for a mistrial, arguing that the prosecutor had inserted ethnic generalizations into the trial. Defense counsel was also concerned with the fact that the prosecutor had asked one juror if she had an opinion about Albanians and the juror responded that they were vindictive troublemakers who were prone to violence. Defense counsel complained that the prosecutor had intimated that defendant's Albanian heritage compelled defendant to kill the victim as some sort of honor killing or because of disrespect.

The trial court determined that the prosecutor was trying to ascertain bias during voir dire when he interjected the fact that defendant was Albanian. But the trial court was persuaded that other comments were inappropriate.

THE COURT: Yeah, I do not find the word 'compound' objectionable. I do not find the word 'patriarch' objectionable. All that means is that he is the head of the family, as you are the patriarch of your family, as your father is deceased. And I don't know the situation of the prosecutor. So I don't find those two terms objectionable. The only objectionable thing I heard at – during that opening

-9-

statement was that "it all boils down to the Albanian nationality." It was right at the very beginning.

*** 

THE COURT: And you couple that with the voir dire question to the juror who responded to your question are you going to be biased, and she says yes, because she perceives Albanians to be whatever she said. And not good, whatever she said wasn't good. So –

MR. FOX [the prosecutor]: Right. But the voir dire question was –

THE COURT: You, by making the statement that Viktor's Albanian put him and his nationality on trial.

Ultimately, the trial court ruled as follows:

THE COURT: I feel, based on things that I heard, that we're putting the ethnicity of the Albanians on trial. They live in compound, which is a rude, crude word, although it's not – it can be interpreted that way, but you could have used they lived together as an extended family. When you start putting all the words together, you're creating an environment, which I agree with Mr. Barkovic, that's hostile, that's associated with the Albanian culture . . .

MR. FOX: And, Judge, as you just indicated when you first started to address this, the word 'compound' was used twice in that half hour or so. Every other time, multiple times, I said a communal environment.

THE COURT: But every time we hear 'compound' on the news, it's never good, ever is it good to hear 'compound' on the news and it's associated with good stuff. Never.

MR. FOX: Judge, I apologize for how it is used on the news –

THE COURT: I am going to grant the mistrial, but I'm not going to find that it was deliberately done. I don't believe that this prosecutor had any deliberate intention, which means we are going to re-pick a jury. And I am ready to do that this afternoon.

The objective facts and circumstances in this case support the trial court's finding that the prosecutor's conduct was unintentional and not meant to goad defendant into moving for a mistrial. It is evident that it was not the prosecutor's intention to poison the jury against defendant, although he did use some unfortunate language. Additionally, the prosecutor strongly opposed defendant's motion for mistrial. We are not left with the definite and firm conviction that a mistake was made.

IV.  PROSECUTORIAL ERROR/MISCONDUCT

-10-

Defendant claims that he was deprived of a fair trial due to the prosecutor's conduct. We disagree.

"Given that a prosecutor's role and responsibility is to seek justice and not merely convict, the test for prosecutorial misconduct is whether a defendant was denied a fair and impartial trial. A defendant's opportunity for a fair trial can be jeopardized when the prosecutor interjects issues broader than the defendant's guilt or innocence." *People v Dobek*, 274 Mich App 58, 63-64; 732 NW2d 546 (2007) (internal citations omitted). However, a prosecutor's remarks must be considered in light of the facts of the case and any of defendant's argument. *Rodriguez*, 251 Mich App at 31. As a result, "[i]ssues of prosecutorial misconduct are reviewed on a case-by-case basis by examining the record and evaluating the remarks in context." *People v Mann*, 288 Mich App 114, 119; 792 NW2d 53 (2010) (internal quotation marks omitted).

### 1. IMPROPER DISCUSSION OF DEFENDANT'S COMPETENCY

Defendant argues that the prosecutor interjected the issue of defendant's competency into trial, conflating the concept of competency with the concept of legal insanity and making no attempt to differentiate between the terms. "A prosecutor's clear misstatement of the law that remains uncorrected may deprive a defendant of a fair trial. However, if the jury is correctly instructed on the law, an erroneous legal argument made by the prosecutor can potentially be cured." *People v Grayer*, 252 Mich App 349, 357; 651 NW2d 818 (2002) (internal citations omitted). The prosecutor did not conflate the concepts of insanity and competence. In fact, the prosecutor indicated that these concepts, as well as the concept of mental illness, were different – "there's a difference, that he was mentally ill, that he was incompetent or that he was legally insane." In any event, the trial court thoroughly and accurately instructed the jury on the issue of insanity and further admonished "[t]he lawyers' statements and arguments are not evidence. They are only meant to help you understand the evidence and each side's legal theories." Thus, to the extent that the prosecutor may have conflated the issues, such error was cured by the trial court's jury instructions.

Prior to selecting a jury at the second trial, a lengthy discussion took place regarding whether defense counsel could present to the jury the fact that defendant had been "locked up" for a year. The prosecutor objected to such a characterization. The trial court permitted defense counsel to discuss defendant's time at the Center for Forensic Psychiatry, with the caveat that the prosecutor would be able to "fill in the gaps" with reference to subsequent orders finding defendant competent. The trial court admonished the prosecutor that it could only tell the jury that defendant was found competent; the prosecutor was prohibited from further explaining that the trial court had previously determined that defendant was a malingerer. The prosecutor provided the jury with an appropriate explanation for defendant's hospitalization and did not violate the trial court's admonishment that evidence that its prior ruling finding defendant to be a malingerer would not be allowed.

### 2. DENIGRATING DEFENDANT AND DEFENSE COUNSEL

During opening statement, the prosecutor stated:

Now as a side note the Judge is going to talk to you about the credibility of witnesses, motivation to testify. No one expects Dr. Shiener to do this out of the goodness of his heart. But make no mistake there's compensation involved.

*** 

But Dr. Shiener doesn't rely on just the MRI and he doesn't rely on these headaches. His biggest reliance is this, Defendant, tell me about yourself. I don't know. What did you do? I don't understand these things, I don't know. Tell me about your family? I don't know. What happened? Where are you? I don't know. How am I supposed to know these things. Dr. Shiener takes Defendant at his word. Because he said I don't know so many times, my gosh, he must be mentally impaired.

*** 

It's a farce, it's a lie, it's a fake. It is what everyone from the Forensic Center says and calls malingering. Defendant is not legally insane. He's not even mentally ill.

*** 

But like I said when it all comes down to the end, when you're sitting in the back and say, oh, Dr. Shiener, well he's older, more experienced. My gosh, Defense might even say, and you might have heard this, he was a professor and he taught Dr. Neal. Yeah, Dr. Neal I think had a couple hours of class (inaudible). Dr. Neal is one of the most respected forensic psychiatrists around. There's a reason he's the head of a division in the Forensic Center. Dr. Neal can teach the old dog some new tricks. And the trick is, tell the truth and don't tell tricks at all. See Dr. Neal you can believe. I submit to you that he will be more credible. Dr. Rinnas I submit to you will be consistent and more credible. Dr. Shiener will tell the opposite. And you all might sit back there and (inaudible) at the time, oh my gosh, but Dr. One said this, Dr. Two said that; Dr. Two said that, Dr. Three said something else. What do you do? You know what you do, you remember November 20th, 2011. Because on November 20th, 2011, that's the Defendant who killed Dashamir. That's the man who grabbed a gun and executed his daughter in law's brother so the rest of the family would hate her. That's the man who was so aware of what he had done that he fled the scene, he dropped the gun, he drove home, he called for help to take him to the police station. Not to take him there, excuse me, he made it there all by himself. But when he got to there to have an interpreter so he could tell the police what he had done. Why? Because what he had done was wrong and he knew it.

There is no defense in this case. He is not legally insane.

There is nothing improper about the prosecutor's arguments. "[A] prosecuting attorney may not personally attack defense counsel," *People v McLaughlin*, 258 Mich App 635, 646; 672 NW2d 860 (2003), and "may not suggest that defense counsel is intentionally attempting to

mislead the jury." *People v Unger*, 278 Mich App 210, 236; 749 NW2d 272 (2008). Likewise, the prosecutor may not personally attack the defendant's credibility with "intemperate and prejudicial remarks" and may not suggest that a defendant or defense counsel is trying to manipulate or mislead the jury. *People v Light*, 480 Mich 1198; 748 NW2d 518 (2008); *People v Bahoda*, 448 Mich 261, 283; 531 NW2d 659 (1995); *People v Watson*, 245 Mich App 572, 592; 629 NW2d 411 (2001). Additionally, a prosecutor "cannot vouch for the credibility of his witnesses to the effect that he has some special knowledge concerning a witness' truthfulness." *Bahoda*, 448 Mich at 276. However, that does not foreclose the prosecutor from arguing that defendant or his witnesses are not worthy of belief. *People v Dobek*, 274 Mich App 58, 67; 732 NW2d 546 (2007). The prosecution is free to argue that defense counsel "bought" expert testimony because such an argument does not "denigrate defense counsel as much as it tend[s] to denigrate the expert witness himself. Moreover, counsel is always free to argue from the evidence presented at trial that an expert witness had a financial motive to testify." *Id.*

### 3. INJECTING MATTERS EXTRANEOUS AND PREJUDICIAL TO DEFENDANT

Defendant argues that the prosecutor also injected issues broader than guilt when it discussed mortgage fraud and the murder of a child. During opening statements, the prosecutor stated:

> We're going to talk about a lot of things that proves the evidence, the elements, and you'll notice one thing we won't necessarily discuss at length, and that's the motive. Because at the end of the day motive doesn't matter. Why'd he do it? There's a lot of people that do a lot of things we're never going to understand. Two weeks ago it was in a newspaper that a man went out and executed a two year old girl in Inkster. You remember that in the news. No one in the world could say that was rational. So the issue of the motive, the question you can have, it's okay to have that question as long as you understand and you agree that we satisfied the elements, and I assure you we will.

> \*\*\*

> You see Arjan and Emira resided in this home for a time. But in 2011 and trust me, there are financial issues you're going to hear about. You're going to hear at one point that the home was being foreclosed with the plan of buying it from the bank as you may have heard was, I don't want to say common practice, but it happened during the housing crisis. When the house was going to go into foreclosure the plan was for the family to buy it back. You're going to hear how they invested in properties and did things like that.

> \*\*\*

> What really was being pushed by dad by the Defendant was, when we move here to Recreation, we improve the home, we sell the home, we make a profit and we use that profit to help buy the house that we were losing in foreclosure, the big home. It was all part of a plan to keep this big family unit together in that large home in St. Clair Shores.

-13-

While "[a] defendant's opportunity for a fair trial can be jeopardized when the prosecutor interjects issues broader than the defendant's guilt or innocence," *Dobek*, 274 Mich App at 63-64, prosecutor's comments were appropriate under the circumstances. As demonstrated by taking the comments in full context, the prosecutor did not inject mortgage fraud into the case; instead, the prosecutor was simply setting forth the background of the case to give the jury a picture of what was happening at the time of the murder. Further, the child's murder was used, not to encourage the jury to convict defendant for an alleged revenge killing, but to indicate to the jury that motive was sometimes an elusive concept. Neither the prosecutor's reference to the foreclosure of the Hoffman home nor the murder of a two-year-old was inappropriate when the statements are viewed in context.

## 4. MISSTATEMENT OF LAW CONCERNING MOTIVE

In addition to stating that "motive doesn't matter," as noted above, the prosecutor also stated" [w]e don't need to prove motive." Again, a prosecutor may not misstate the law, *Grayer*, 252 Mich App at 357, but there is nothing in the prosecutor's comments that misstates the law. Defendant is correct that "[a]lthough motive is not an essential element of the crime, evidence of motive in a prosecution for murder is always relevant." *Unger*, 278 Mich App at 223. However, the prosecutor's statement that motive "doesn't matter" was completely accurate. The prosecutor was simply telling the jury that it did not have to understand defendant's motive in order to convict him of first-degree premeditated murder. Additionally, as previously stated, the trial court instructed the jury that "[t]he lawyers' statements and arguments are not evidence. They are only meant to help you understand the evidence and each side's legal theories." Thus, to the extent the prosecutor misstated the law, the error was corrected in the trial court's instructions to the jury.

## 5. MOTION FOR MISTRIAL

Defendant argues that the trial court erred in denying defense counsel's motion for a mistrial. We disagree.

> We review for an abuse of discretion a trial court's decision regarding a motion for a mistrial. This Court will find an abuse of discretion if the trial court chose an outcome that is outside the range of principled outcomes. A trial court should grant a mistrial only for an irregularity that is prejudicial to the rights of the defendant and impairs his ability to get a fair trial. [*People v Schaw*, 288 Mich App 231, 236; 791 NW2d 743 (2010) (internal quotation marks and citations omitted).]

Having concluded that none of the above statements were erroneous, there was no basis for a mistrial and that trial court did not abuse its discretion in denying defendant's motion.

## 6. CLOSING ARGUMENT

Many of the prosecutor's arguments at closing were similar to those he made in his opening statement. For the same reasons as previously stated, there is no basis for defendant's claim that the prosecutor's closing argument deprived him of a fair trial. As previously discussed, the prosecutor was within his right to argue that Shiener was not an independent

witness and that the prosecutor's witnesses were worthy of belief. The prosecutor was also at liberty to attack defendant's insanity defense.

## V. ACCOMMODATIONS UNDER THE ADA

Defendant next argues that defendant's mental disability qualified him for accommodations under the Americans with Disabilities Act (ADA), 42 USC 1201 et seq, and that the trial court erred in failing to appoint defendant lawyer-guardian ad litem (L-GAL). We disagree.

Defendant claims that he was denied a fair trial. Such a constitutional question is reviewed de novo on appeal. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002).

Defendant's argument that the trial court should have appointed an L-GAL fails because (1) defense counsel failed to show that defendant was, in fact, disabled; and, (2) even if defendant was disabled, the law did not compel that an L-GAL be appointed, especially where defendant had competent legal counsel and had been appointed a guardian in the probate court.

Under the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 USC 12132. "The term 'qualified individual with a disability' means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, . . .communication, . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 USC 12131. As the trial court repeatedly found, defendant was competent to stand trial and was malingering. While defendant claims that the inquiry of whether defendant was competent to stand trial is different from an inquiry as to whether defendant had a mental disability, the fact remains that defendant used the same symptoms to cover competence, mental illness and insanity. Not having a disability, defendant was not entitled to accommodations under the ADA.

Additionally, as defendant concedes, there is no case law to support his position that a defendant, who already has competent counsel and a guardian from a prior probate matter, must also have an L-GAL. In *People v Whyte*, 165 Mich App 409, 414; 418 NW2d 484 (1988), the Court noted: "Appellate counsel also argues that because he is unable to communicate with his client, due to his client's incompetency, a guardian ad litem should be appointed for defendant. We decline to engraft such a device on a criminal proceeding." Citing *Whyte*, this Court has also rejected a similar argument in an unpublished case:

> On appeal, defendant argues that the trial court, knowing of his mental disorders, denied him a fair trial when it failed to sua sponte petition the probate court for appointment of a guardian to make informed decisions on his behalf. Defendant also argues that he was denied the effective assistance of counsel when defense counsel failed to seek the appointment of a guardian for such purpose. We find neither argument sufficient to provide a basis to disturb defendant's conviction.

Defendant is correct that the Estates and Protected Individuals Code (EPIC), MCL 700.1101 *et seq.,* allows a person interested in the welfare of an incapacitated individual to petition the probate court for appointment of a guardian for the incapacitated individual. See MCL 700.5303(1). However, defendant concedes that there is no authority from which it can be concluded that the guardianship provisions of the EPIC were intended to be, or should otherwise be construed as, applicable to criminal proceedings. Moreover, defendant has failed to provide any argument or authority to persuade us that a criminal defendant who suffers from a mental or personality disorder but has been found competent to stand trial is unable to make intelligent and informed decisions on his own behalf. In the absence of any such argument or authority, we are not inclined to extend the provisions of the EPIC to criminal proceedings, or to otherwise hold that a defendant found competent to stand trial is entitled to the appointment of a guardian. See *People v. Whyte,* 165 Mich App 409, 414; 418 NW2d 484 (1988) (declining "to engraft such a device on a criminal proceeding"). Thus, we reject defendant's argument that he was deprived of a fair trial as a result of the trial court's failure to sua sponte seek appointment of a guardian. [*People v Lulow*, unpublished opinion per curiam of the Michigan Court of Appeals, issued October 24, 2006 (Docket No. 246110) slip op, pp 1-2 (2006) lv den 477 Mich 1112 (2007).]

Defendant was not entitled to an L-GAL and was, therefore, not deprived of a fair trial.

## VI.  RIGHT TO PRESENT A DEFENSE/ADMISSION OF EVIDENCE

Defendant argues that the trial court essentially deprived him of presenting a defense when it denied defendant's request to have two orders from the Macomb County Probate Court admitted into evidence.  Defendant maintains that the orders, which appointed defendant a guardian and conservator, were relevant to his mental health history.

"This Court reviews preserved evidentiary issues for an abuse of discretion.  A trial court abuses its discretion when it chooses an outcome that is outside the range of reasonable and principled outcomes."  *People v Orr*, 275 Mich App 587, 588-89; 739 NW2d 385 (2007) (internal footnote omitted).  "This Court  . . .reviews de novo the constitutional question whether a defendant was denied [his] constitutional right to present a defense."  *People v Kurr*, 253 Mich App 317, 327; 654 NW2d 651, 656 (2002).

The trial court did not abuse its discretion when it refused to allow defense counsel to introduce the orders.  Defendant acknowledges *People v Carpenter*, 464 Mich 223; 627 NW2d 276 (2001), which has held:

The Legislature has enacted a comprehensive statutory scheme setting forth the requirements for and the effects of asserting a defense based on either mental illness or mental retardation. We conclude that, in so doing, the Legislature has signified its intent not to allow evidence of a defendant's lack of mental capacity short of legal insanity to avoid or reduce criminal responsibility by negating specific intent. Rather, the insanity defense as established by the

-16-

Legislature is the sole standard for determining criminal responsibility as it relates to mental illness or retardation. Consequently, we affirm the decision of the Court of Appeals on this alternative basis. [*Id.* at 241.]

But defendant argues that *Carpenter* "left open the possibility that if there is another valid reason to admit this evidence it may be admissible." (Defendant's Brief on Appeal, p 43.) He cites *People v Burns,* unpublished opinion per curiam of the Court of Appeals, issued September 18, 2012 (Docket No. 305037), which noted:

"Hence, a defendant is not entitled to offer evidence of a lack of mental capacity for the purpose of avoiding or reducing criminal responsibility by negating the intent element of an offense." *People v Yost,* 278 Mich App 341, 354–355; 749 NW2d 753 (2008). "[T]his does not mean[, however,] that a defendant who is legally sane can never present evidence that he or she is afflicted with a mental disorder or otherwise has limited mental capabilities." *Id.* at 355. If such evidence is offered "for a relevant purpose other than to negate the specific intent element of the charged crimes," it may be admissible. [*Burns*, slip op, p 2.]

However, in *Burns,* this Court ultimately affirmed the trial court's decision to preclude evidence of the defendant's unusual behavior prior to the crime.

Defendant argues that, in this case, the evidence was relevant to "rebut the claim that Mr. Shaholli's defense was a complete fabrication and to show that he did not suffer from a mental illness as was determined by the [Macomb County Probate Court]," and was admissible under MCL 600.2106, which provides:

A copy of any order, judgment or decree, of any court of record in this state, duly authenticated by the certificate of the judge, clerk or register of such court, under the seal thereof, shall be admissible in evidence in any court in this state, and shall be prima facie evidence of the jurisdiction of said court over the parties to such proceedings and of all facts recited therein, and of the regularity of all proceedings prior to, and including the making of such order, judgment or decree.

Defendant cites *People v Dray,* 469 Mich 979; 671 NW2d 873 (2003), wherein our Supreme Court reversed this Court's finding that the trial court did not err in denying a motion to introduce a probate court order regarding the appointment of a guardian. The Supreme Court determined that such an order was admissible pursuant to MCL 600.2106. However, defendant fails to point out that in *Dray* it was the *prosecution* who sought to introduce evidence of the *victim's* lack of capacity to consent to an alleged kidnapping. *People v Dray,* unpublished opinion per curiam of the Court of the Appeals, issued August 7, 2003 (Docket No. 242622). *Dray* does not support defendant's position and does not change the fact that evidence of defendant's mental capacity was inadmissible under *Carpenter*.

Because the trial court did not abuse its discretion in refusing to allow the evidence, it cannot be said that its decision denied defendant the right to present a defense. "A criminal defendant has a right to present a defense under our state and federal constitutions," which

necessarily includes evidence that "might influence the determination of guilt." *People v Anstey*, 476 Mich 436, 460; 719 NW2d 579, 593 (2006). Defendant pursued the defense of legal insanity and presented expert testimony that he suffered from mental illness – severe depression and vascular dementia – such that he could not appreciate the consequences of his actions. The probate orders were not necessary for defendant to pursue an insanity defense.

## VII. MOTION FOR NEW TRIAL

Finally, defendant argues that although the trial court was presented with a substantial motion for new trial, it cut off defense counsel's arguments at the hearing and did not entertain each claim of error. In essence, defendant claims that the trial court abused its discretion when it denied the motion without exercising its discretion. We disagree.

"We review a denial of a motion for new trial for an abuse of discretion." *Unger*, 278 Mich App at 232.

Defendant's motion for new trial alleged the following errors:

1) The trial court abused its discretion in finding Mr. Shaholli competent to stand trial while he was mentally ill to the extent that he did not understand the nature and object of the charges against him, and was unable to communicate with or assist counsel in the preparation of his defense;

2) The trial court's finding that the prosecutorial misconduct resulting in a mistrial was unintentional was clearly erroneous and the subsequent retrial, resulted in a violation of Mr. Shaholli's federal and state right against double jeopardy . . .;

3) Mr. Shaholli's convictions of first-degree premeditated murder and felony-firearm were the product of prosecutorial misconduct where the prosecutor's opening statement, closing argument and actions denigrated the defendant and defense, conflated and misstated legal concepts that confused and mislead [sic] the jury and intentionally made improper, highly inflammatory and prejudicial remarks to the jury while interjecting extraneous factors into the trial;

4) The court erred in refusing to grant Mr. Shaholli's motion for accommodation under the [ADA];

5) The trial court committed clear error in refusing to appoint a[n L-GAL] to assist Mr. Shaholli in the criminal proceeds, forcing conflicted trial counsel to act as advocate and guardian of his client, two mutually exclusive roles that adversely affected his ability to properly represent Mr. Shaholli's interests and provide effective counsel, and contrary to Michigan Rules of Professional Conduct (MRPC) 1.14;

6) The court erred where it refused to admit evidence of the finding of [the probate court] orders finding that Mr. Shaholli was mentally ill and could not conduct normal daily activities of financial matters, which were relevant to his

defense, admissible and implicated his right to present a defense. [10/10/14 Motion for New Trial, Lower Court File Vol II.]

Although the trial court may have not separately addressed each issue at the hearing, it had previously addressed all of the issues on numerous prior occasions. Because we have concluded that none of these claims of error have merit, it cannot be said that defendant suffered any prejudice as a result of the trial court's abbreviated treatment of the motion.

Affirmed.

/s/ Michael J. Kelly
/s/ Mark J. Cavanagh
/s/ Kirsten Frank Kelly